**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

**TYISHA CHANCEY,**

**Case No.: 1:26-cv-00764**

**Plaintiff,**

**-against-**

**TENAGLIA & HUNT, P.A., and**
**DATA SEARCH NY INC. d/b/a TRAKAMERICA,**

**Defendants.**

------------------------------------------------------------------X

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Tyisha M. Chancey ("Chancey," "Ms. Chancey," or "Plaintiff"), hereby files suit against Defendants Tenaglia & Hunt, P.A. ("Tenaglia") and Data Search NY Inc., d/b/a TRAKAmerica ("TRAKAmerica" or "Trak"), for their violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 *et seq.*, conversion, and gross negligence, and hereby alleges as follows:

## SUMMARY OF CLAIMS[1]

Defendant debt collection law firm Tenaglia & Hunt, P.A. ("Tenaglia") filed a collection action against Plaintiff Tyisha Chancey on April 3, 2019, for a defaulted credit card debt owed to Barclays Bank Delaware. Ms. Chancey filed a *pro se* answer, appeared in court on October 2, 2019, and, feeling overwhelmed and pressured, entered into a stipulation of settlement with a payment plan.

Critically, if there were a default in payments and Tenaglia wished to enter a judgment on the defaulted balance, the stipulation required Tenaglia to first file a motion for default judgment with at least ten days of notice to Ms. Chancey. Instead, Tenaglia moved directly to the entry of

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

judgment without notice or motion. Further, Tenaglia inflated the amount of the judgment by failing to credit the six payments made by Ms. Chancey as required in the stipulation. Tenaglia then used the unlawfully obtained and inflated judgment to issue a bank restraint, ambushing Ms. Chancey with a freeze of her bank account.

All of the money in the bank account, unemployment payments and child support payments, was exempt from restraint. Tenaglia and its collection management contractor, Defendant TRAKAmerica ("Trak"), then stonewalled Ms. Chancey for months as she tried both in and out of court to secure the return of her exempt funds. On or about May 1, 2025, Tenaglia, through the New York City Marshal, levied $4,040.37 from Ms. Chancey's Chase bank account, leaving a balance a balance of only $741.20. Even if *none* of the money in the account were otherwise exempt, the first $4,080 of her account would always be exempt under the New York Exempt Income Protection Act, CPLR 5222-a ("EIPA"), meaning that Tenaglia levied $3,299.17 to which it had no lawful right.

Ms. Chancey then filed a *pro se* order to show cause to vacate the fraudulently obtained judgment and to have returned the levied exempt funds. In her OSC, Ms. Chancey noted that Tenaglia never filed a motion to enter default nor provided notice of the same, conditions precedent to being able to lawfully obtain a judgment. In addition, Ms. Chancey provided extensive documentation establishing that, as a matter of arithmetic, all of the funds in the bank account were deposits from unemployment benefits or child support payments, and thus exempt from restraint or seizure under EIPA.

Tenaglia then doubled down by vigorously opposing Ms. Chancey's *pro se* Order to Show Cause. Defendants held Ms. Chancey's exempt funds for months while in possession of documentation conclusively demonstrating their exempt status, only returning the money weeks

after receiving a court order vacating the judgment and a letter from Ms. Chancey demanding return of the money because the vacature of a judgment requires the return of any previously levied funds. Ms. Chancey now files suit to hold Defendants accountable for their violations of state and federal law.

## PARTIES

1. Plaintiff Tyisha M. Chancey is a natural person and a resident of Bronx County, New York.

2. Defendant Tenaglia & Hunt, P.A., ("Tenaglia") is a debt collection law firm organized under the laws of the state of New Jersey and headquartered in Rochelle Park, New Jersey, which does business in New York State. This lawsuit arises out of Tenaglia's business in New York State.

3. Tenaglia is a debt collection law firm which regularly collects on hundreds (if not thousands) of defaulted consumer debts on behalf of putative creditors (either original creditors or debt buyers) by sending collection letters, filing collection lawsuits, and enforcing judgments, and that is its principal purpose. Therefore, Tenaglia is a debt collector as defined by the Fair Debt Collection Practices Act ("FDCPA").

4. Defendant Data Search NY Inc. d/b/a TRAKAmerica ("Trak") is a debt collection company organized under the laws of the state of New York and headquartered in Bonita Springs, Florida. This suit arises out of Trak's action in New York against Ms. Chancey, a New York resident.

5. Trak is a debt collector as defined by the FDCPA and is jointly and severally liable for the acts of Tenaglia committed on Trak's behalf for the reasons stated in the section of the complaint below entitled "Trak is Integral to Tenaglia's Collection Attempts as to Ms.

Chancey." By way of example and not limitation, Trak provides collection management services between Barclays and Tenaglia. An FDCPA lawsuit filed against Tenaglia in 2024 for Tenaglia's debt collection litigation misconduct on behalf of Barclays documented an integral role Trak played in its collection against another New York consumer. Trak has its own "TRAKAmerica Supplier Work Standards" manual that it requires the collection law firms in its attorney network (such as Tenaglia) to comply with. When a debt collector collects money, it takes its own share, pays the balance to Trak (who takes its own share) and forwards the balance to the creditor. In the case at bar, there is evidence in the case at bar that Trak was the intermediary between Tenaglia and Barclays for the account Tenaglia was seeking to collect from Ms. Chancey through the debt collection lawsuit and resulting judgment. When Ms. Chancey called Tenaglia to ask about why they froze her account and how to get the money released, Tenaglia told her to call Trak because Trak had "taken over the account." That suggests that Trak was not only involved with Tenaglia's collection attempts but directing or controlling Tenaglia's debt collection litigation and judgment enforcement. In addition, when Tenaglia ultimately returned part of the money illegally seized after the marshal took its fee, the check was written from Tenaglia's "TrakAmerica Barclays Trust Account." Trak is also a debt collector because it collects hundreds of thousands of consumer accounts (either on behalf of original creditors or debt buyers) through its network of attorney debt collectors and non-attorney debt collectors. Trak's primary (and indeed exclusive) purpose is the collection of consumer debts, either directly or indirectly through its networks.

## STATEMENT OF FACTS

### *Background: Underlying Collection Lawsuit and Stipulation of Settlement*

1. At one point, Ms. Chancey had a card account with Barclays Bank of Delaware ("Barclays"), on which she defaulted.

2. On April 3, 2019, Defendant Tenaglia filed suit on behalf of Barclays against Ms. Chancey. *See* **Exhibit A** (Summons and Complaint).

3. Ms. Chancey filed her *pro se* Answer on May 23, 2019. *See* **Exhibit B** (Chancey Answer).

4. In court on October 2, 2019, Defendant Tenaglia entered into a payment-plan stipulation with Ms. Chancey. **Exhibit C** (Stipulation).

5. Ms. Chancey did not draft this stipulation and did not even propose its terms, including waiver of her legal rights to challenge service of the summons and complaint, but signed as instructed and made payments, seeking to do her best to reduce the amount of the alleged debt in her name. *See* **Exhibit C** (Stipulation), **Exhibit D** (Affirmation in Support of September 2025 Order to Show Cause).

6. Soon after signing the stipulation, Ms. Chancey began paying Defendant Tenaglia $25 per month. Ms. Chancey ceased making payments around May 2020, during the financial strain of the COVID 19 shutdown. Ms. Chancey paid $150 pursuant to this stipulation before defaulting. *See* **Exhibit E** (Payment history).

7. Under the terms of the stipulation, if Ms. Chancey was to fall behind on payments, Tenaglia was first required to mail a 10-day notice to cure before seeking to enforce the stipulation. *See* **Exhibit C, ¶ 7**. ("In the event of default, a 10 day notice to cure such default will be mailed by ordinary mail to the Defendant his last known address…")

8. Critically, if there were breach of the payment plan that was uncured after the ten day notice, and Tenaglia wished to enter a judgment based on that breach, the stipulation

required Tenaglia to first file a motion for default judgment with at least ten days of notice of the motion[2] to Ms. Chancey, and that the application must credit any payments made. *See* **Exhibit C** (Stipulation) ("[I]f such default remains uncured for ten (10) days from the date of mailing, then Plaintiff ***shall file a motion for default judgment*** against the Defendant in the amount listed within the complaint, plus costs if any, disbursement, and interest, ***less any payments*** already received." (emphasis added)).

***Tenaglia Abandons the Case for Four Years, Then Violates the Terms of the Stipulation by Entering an Inflated Judgment Without Notice or Motion***

9. After defaulting on the payment plain, Ms. Chancey never received the prerequisite ten-day notice to cure from Tenaglia.

10. More to the point, Tenaglia did not make the motion for judgment required by its own terms, or provide Ms. Chancey notice of the motion. *See* **Exhibit F** (October 7, 2025 Order Vacating Judgment). Instead, Defendants proceeded directly to the entry of judgment (after letting the case idle for more than four years.)

11. On December 7, 2024, Tenaglia caused a judgment to be entered against Ms. Chancey for $5,040.96—the full $4,940.96 Defendants had sued for in addition to costs, in violation of Tenaglia's stipulation. The terms of the stipulation required crediting any payment; therefore, following the stipulation, judgment would be entered for $4,940.96 after crediting payments made, and, critically, only after a motion to enter judgment based on a putative breach

[2] The parenthetical in the order requiring ten-day notice of motion to enter default judgement (which is separate from the notice of default) apparently has a typographical error in reversing the terms "plaintiff" and "defendant." The order states, as to the notice of motion, "Should the defendant move, it is his/her obligation to notify Plaintiff's counsel within 10 days." **Exhibit C** (Stipulation), ¶ 7, last sentence. Obviously, a motion for default judgment for breach of a payment plan stipulation could only be made by a plaintiff, not a defendant. In any event, the default rule under the CPLR is that Tenaglia was required to provide a notice of motion, especially as the stipulation required credit for payments made.

of the stipulation, and notice of the motion. *See* **Exhibit G** (December 7, 2024 Judgment); **Exhibit C** (Stipulation).

***Tenaglia Uses the Unlawful Judgment to Freeze Ms. Chancey's Bank Account, Which Contains Solely Exempt Funds, Then Levies $4,035.37 of the Exempt Funds Exempt Funds***

12. Tenaglia executed a Restraining Notice and an Information Subpoena dated January 29, 2025 and thereafter served them on Chase Bank, where Ms. Chancey has a bank account. **Exhibit H** (January 29, 2025 Restraining Notice and Information Subpoena.)

13. On or around February 6, 2025, Ms. Chancey's checking account, containing exempt child support and unemployment benefits, was frozen. Child support payments and unemployment payments are exempt from restraint.

14. On February 10, 2025, two weeks after the date of the Restraining Notice, days after freezing Ms. Chancey's bank account, and more than two months after entering judgment, Defendants belatedly mailed Ms. Chancey a Notice of Entry of the default judgment. **Exhibit I** (February 10, 2025 Notice of Entry).

15. Frantic, Ms. Chancey immediately sought information as to the freezing of her checking account and was directed to Tenaglia.

16. Ms. Chancey would call Tenaglia's office many times over the course of the months her funds were frozen and later seized, but most of those times no one answered nor called her back when she left messages. On the rare occasions when Ms. Chancey was able to contact Tenaglia to inquire about the freeze of her account and later the seizure of her money, she encountered hostile debt collectors who only provided minimal information, amounting only to the amount of the debt Tenaglia alleged to be owed.

17. Ms. Chancey also called Barclays after her bank account was restrained to find out more information and to try to get her account released. Barclays told Ms. Chancey that TrakAmerica had "taken over the account," provided her their number, and told her to call them.

18. When Ms. Chancey called TrakAmerica, she was told to contact Tenaglia.

19. Tenaglia issued an Execution with Notice to Garnishee Upon Marshal Ronald Moses dated April 1, 2025 and Marshal Moses issued a Return of Execution dated May 21, 2025, indicating that the marshal had levied and applied $3,732.02 from Ms. Chancey's bank account in partial satisfaction of the judgment. *See* **Exhibit J** (Execution and Notice). The Marshal also levied an additional $303.35 for its own poundage and levy fees. In total, Tenaglia caused *$4,035.37* to be levied from Ms. Chancey's bank account. All of those levied funds were exempt unemployment and child support funds.

20. On May 1, 2025, Chase removed $4,040.37[3] from Ms. Chancey's restrained savings account. *See* **Exhibit K** (Chase bank account statement of May 27, 2025 for Ms. Chancey's savings account). Importantly, there was only $4,781.54 in the account when it was levied upon, leaving a remaining balance of just $741.20. Under the New York Exempt Income Protection Act, CPLR 5222-a, the first $4,080 of Ms. Chancey's bank account is entirely exempt from restraint or levy, even if *none* of the money was otherwise exempt. The information subpoena that Tenaglia served on Chase asked, *inter alia*, the balance of her Chase bank account. Therefore, on information and belief, Tenaglia knew that her restrained Chase bank account contained approximately 4,781.54 and yet levied $4,035.37. Therefore, if nothing else, Tenaglia knew it was levying an amount include all but $741.20 of the base amount of exempt funds of any bank account.

[3] It is unclear why there is a discrepancy from the $4,040.37 that the bank statement indicates was withdrawn and what appears to have been $4,035.37 levied by Tenaglia, the sum of the amount applied towards the judgment and amount Marshal Moses took for his fees.

***Tenaglia Doubles Down, Vigorously Opposing Ms. Chancey's Pro Se Order to Show Cause to Vacate the Fraudulently Obtained Judgment, Release the Freeze on Her Bank Account, and Return the Levied Exempt Funds***

21. On September 3, 2025, Plaintiff filed a *pro se* Order to Show Cause and supporting Affirmation In Support of Order to Show Cause to Cease Enforcement, Return Funds and Modify [Vacate] Judgment, along with 93 pages of supporting documents. *See* **Exhibit L** (September 3, 2025 Order to Show Cause and Affirmation in Support) ("OSC").

22. The OSC provided irrefutable documentary evidence that all of the money in the restrained bank account was unemployment funds and child support payments, which are exempt from restraint.

23. Specifically, Exhibit D to the OSC provided a detailed spreadsheet accounting for each of the unemployment funds deposits and each of the child support payment deposits. Exhibit D also contained the child support order and a payment history of the child support payments. In addition, Exhibit D contained 70 pages of Chase bank statements showing each deposit of unemployment benefits. The bank statements identify each deposit as from "Nys DoL UI Dd," which are the abbreviations for New York State Department of Labor Unemployment Direct Deposit. The statements also documented the transfer of those exempt funds from one account into the restrained account. As explained in the Affirmation ¶¶ 10, 11, 18-20, Exhibit D demonstrates as a matter of law – and of arithmetic – all of the funds in the restrained bank account were exempt.

24. On or about October 2, 2025, Tenaglia filed Defendants' Affirmation in Opposition and Exhibits. *See* **Exhibit M** (Opposition and Exhibits). Tenaglia simply had no response to Ms. Chancey's documentation that all of the money in the account was exempt. Nor did Tenaglia have a response to the OSC pointing out that the face of the of the stipulation required Tenaglia to file and serve a motion to enter judgment for a breach of the stipulation's

payment plan. Tenaglia admitted that it received $150 in payments but did not challenge the assertion that the judgment inflated the amount of the debt by failing to credit the payments. Instead, Tenaglia simply argued that it had mailed a notice of a breach of the payment plan, which is only the first step it was required to take prior to seeking entry of a default judgment. In sum, Tenaglia had no basis to oppose the vacatur of the default judgment or delay the return of the exempt funds, but instead of stipulating to do so, it dragged out the court process against Ms. Chancey, to wear her down to pay or give up, or in the hopes she may fail to attend a hearing and have her application denied.

25. On October 7, 2025, the Court ordered vacatur of the judgment for Tenaglia's failure to comply with the terms of its own stipulation with Ms. Chancey. *See* **Exhibit F** (October 7, 2025 Order, noting "Plaintiff failed to file a prerequisite motion to enter judgment as its own stipulation required.") The order vacated the judgment and ordered a release of all bank restraints or garnishments.

26. Moving to enter judgment without filing a motion for entry of judgment, as required on the face of the stipulation, as well as doubling down after receiving the Order to Show Cause referencing that specific requirement, suggests a lack of meaningful attorney involvement in the collection lawsuit and in the judgment enforcement.

27. On October 14, 2025, Plaintiff mailed Defendants and New York City Marshal Ronald Moses written demands to return the wrongfully garnished funds. The letter cited decisions holding that the vacatur of a judgment requires the return of previously levied funds. *See* **Exhibit N** (October 14, 2025 Letter and Mail Receipts). Plaintiff incurred $33.70 in postage expenses for this mailing.

28. Tenaglia's delay in complying with the order of the court also suggests a lack of meaningful attorney involvement in the debt collection litigation and judgment enforcement of the firm.

29. On October 23, 2025, after unlawfully freezing Plaintiff's bank account for more than eight months, and unlawfully seizing and holding $4,035.37 in exempt funds for more than five months, Tenaglia finally refunded to Ms. Chancey $3,737.02 of her exempt funds. On November 4, 2025, Marshal Moses refunded an additional $303.35 in poundage and costs. **Exhibit O** (Refund Check from Tenaglia); **Exhibit P** (Refund Check from Marshal)

30. Notably, the check sent by Tenaglia was drawn from the account of "TrakAmerica Barclays Trust Account."

31. Unable to continue to proceed *pro se* against Tenaglia, Ms. Chancey was fortunate enough to obtain assistance from the Legal Aid Society. On or about October 29, 2025 attorney Claire Mooney of the Legal Aid Society filed a notice of appearance.

32. The underlying collection lawsuit is pending. However, Ms. Chancey is filing this FDCPA collection lawsuit as the statute of limitations for the FDCPA is approaching. In any event, the claims brought by Ms. Chancey in this complaint are unrelated to the resolution of the underlying collection lawsuit.

***Trak is Integral to Tenaglia's Collection Attempts as to Ms. Chancey***

33. Trak is an intermediary between putative creditors (either original creditors or debt buyers) and debt collectors, both non-attorney collection agencies and debt collection law firms. Trak provides collection management services between the creditors and debt collectors. **Exhibit Q** (deposition of Crystal Torres, corporate representative for Trak, in *Oglesby v. Alltran*

*Financial*, *et al*., Case No. 1:19-cv-01834, E.D.N.Y.) p. 5:1-9 (designating a Trak corporate representative), 12:14-13:8 (corporate representative describing the work of Trak.)

34. Trak has control over the collection methods of the collection firms its utilizes in its attorney network. For example, Trak has its own "TRAKAmerica Supplier Work Standards" manual that is requires the collection law firms in its attorney network to comply with. **Exhibit R** (standard Trak Legal Services Agreement with its network attorneys), p. 2 item A. When a debt collector collects money, it takes its own share, pays the balance to Trak, who takes its own share, and forwards the balance to the creditor. *Id.* p. 3 items K, L; p. 4 item III.

35. In the case at bar, there is evidence that Trak was the intermediary between Tenaglia and Barclays for the account Tenaglia was seeking to collect from Ms. Chancey through the debt collection lawsuit and resulting judgment.

36. First, when Ms. Chancey called Barclays about her frozen bank account, Barclays told her to call Trak because Trak had "taken over the account," and gave her the telephone number for Trak. When Ms. Chancey called Trak, they told her to call Tenaglia. This suggests that Trak was directing or controlling the debt collection litigation and judgment enforcement, or, at a minimum, was involved in the collection of the judgment.

37. Second, when Tenaglia ultimately returned part of the money illegally seized after the marshal took its fee, the check from the was written from its "TrakAmerica Barclays Trust Account." *See* **Exhibit O**.

38. Further, in a recent FDCPA lawsuit against Tenaglia for its debt collection litigation misconduct in seeking to collect from a consumer a debt allegedly owed to Barclays, discovery indicated that Trak was actively involved in the debt collection litigation as an intermediary between Tenaglia and Barclays. See **Exhibit R** (Plaintiff's letter motion to compel,

September 3, 2025, *Garo v. Tenaglia & Hunt, P.A.,* 1:24-cv-9812, S.D.N.Y.). According to the Motion to Compel, Trak was deeply involved in the debt collection activity of Tenaglia in the debt collection litigation nominally in the name of Barclays:

> "In its First Revised Responses to Plaintiff's First Request for Production of Documents, [Tenaglia] produced documents which disclosed for the first time that a third party entity, TrakAmerica, had knowledge of and was deeply involved in the underlying debt collection. Based on [Tenaglia's] production, TrakAmerica's role went well beyond placing the account with [Tenaglia] for collection and raises a question as to whether TrakAmerica or Barclays Bank, the creditor and named plaintiff in the underlying collection case, was [Tenaglia's] actual client.
> […]
> "A "Legal Services Agreement" between TrakAmerica and [Tenaglia], produced by TrakAmerica in response to a subpoena, indicates that [Tenaglia] was required to use templates, software, and procedures provided by TrakAmerica in filing the underlying debt collection action, as well as that TrakAmerica provided all documents relating to the case to [Tenaglia]."

39. For these reasons and others, Tenaglia and Trak are jointly and severally liable for the litigation misconduct (apparently) engaged in by Tenaglia as to Ms. Chancey.

***Tenaglia's Persistent Unlawful Conduct Inflicted Considerable Emotional Distress On a Single Mother and Wrongfully Deprived Her of Thousands of Dollars for Months***

40. As Tenaglia did not comply with the terms of the stipulation requiring notice and motion, Plaintiff only learned of the judgment against her when her account was frozen. Immediately, Plaintiff worried about how she was going to pay her son's college tuition.

41. Beginning with the freeze of her funds, and continuing throughout the duration of her attempts to get her money back, Plaintiff lost sleep nearly every night, struggling both to fall asleep and to stay asleep.

42. Plaintiff's attempts to contact Defendants were unsuccessful, or met with hostility on the rare occasion when she was able to at least speak with a receptionist (who rudely dismissed her.)

43. Due to the stress, Plaintiff gained 25 pounds, and her hair began falling out.

44. Plaintiff feared these symptoms could be due to a more serious underlying medical condition, but Plaintiff's doctors found no medical explanation for these symptoms other than stress.

45. Plaintiff cried regularly from stress and frustration during her ordeal.

46. While Plaintiff kept the nature of her problems private, numerous witnesses including her mother and her friends noticed the readily apparent and negative changes in Plaintiff's health, mental state, and demeanor, noting that she appeared unusually tired and stressed, and in some cases even sharing Plaintiff's worry that a more serious medical cause for the symptoms existed.

47. Plaintiff's physician instructed her to begin taking melatonin and vitamins to assist with the symptoms and prescribed minoxidil for the hair loss.

48. Attending the hearing in 2025 brought back memories of the original 2019 hearing, at which Ms. Chancey was unrepresented, alone, and struggling with troubles both financial and mental.

49. While Ms. Chancey was represented by counsel and reassured by their presence at the 2025 hearing, as a consequence of those unpleasant and emotional memories, the 2025 court hearing was "an out-of-body experience."

50. Ms. Chancey experienced severe anxiety surrounding the 2025 hearing due to her memories of the 2019 hearing.

## COUNT 1: FAIR DEBT COLLECTION PRACTICES ACT

51. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

52. For the reasons stated in the "Parties" section of this Complaint, Tenaglia and

TrakAmerica are debt collectors within the meaning of 15 U.S.C. § 1692a(6).

53. The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative debt was incurred primarily for family, personal or household purposes. The Summons & Complaint in the Collection Lawsuit alleged the obligation arose from a consumer credit transaction.

54. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

55. Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation, Defendants materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; making false representations of the character, amount, or legal status of any debt; making false representations of any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt; making a false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; representing or implying that the nonpayment of any debt will result in the seizure, garnishment, attachment, or sale of any property unless such action is lawful; the failure to make the disclosures required by 1692e(11); using any false representation or deceptive means; and using unfair or unconscionable means.

56. The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

57. Plaintiff suffered economic injuries that historically have provided a basis for

lawsuits in American courts, including but not limited to theft of funds contained in her bank account; out of pocket expenses for postage and for travel to and from court; lost time spent going to the courthouse, to appear on her OSC to return funds that were exempt from execution, and to gather evidence for the OSCs, among other related expenses.

58. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: conversion, trespass to chattels, defamation, negligence, gross negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

59. Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of personnel to attempt to collect the debt, in ensuring that property exempt from execution is not restrained or garnished, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

**COUNT 2: CONVERSION**

44. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

45. The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

46. Property subject to conversion includes funds contained in bank accounts.

47. Defendants, intentionally and without authority, assumed and exercised control over Plaintiff's bank account funds with a false affidavit of service, despite being put on notice by Plaintiff and her legal services counsel that the funds were exempt from execution and the judgment obtained was for an inflated amount, interfering with her right to possession of the same.

48. In other words, Defendants never had a legitimate basis or authority to restrain and then seize Plaintiff's bank account, and thus the bank account garnishment from its onset constituted conversion.

49. Defendants' improper seizure of and failure to return Plaintiff's money, which harmfully interfered with Plaintiff's rights to control her own property, constitutes conversion.

50. For the reasons stated in the statement of facts, Defendants' conduct was gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

51. For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual damages include, *inter alia*, the loss of use of money for the period Defendants wrongfully exercised dominion and control over Plaintiff's funds, and consequential damages resulting therefrom. Plaintiff suffered serious mental distress and disruption of her daily life.

**<u>COUNT 3: GROSS NEGLIGENCE</u>**

52. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

53. Defendants had statutory and common law duties, violated those duties, and as such committed negligence *per se*. Plaintiff is not bringing a claim of mere negligence, but uses the negligence per se violation as a violation of a predicate duty upon which her gross negligence claims are based.

54. Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

55. Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

56. Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

57. To the degree Plaintiff's claim of gross negligence is inconsistent with the other claims in this action, the gross negligence claims are brought in the alternative.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

a. A declaration that Tenaglia and TRAKAmerica have committed the violations of law alleged in this action;

b. Statutory damages;

c. Reasonable attorney's fees and costs;

d. Actual damages;

e. Exemplary and punitive damages;

f. Prejudgment and post judgment interest as allowed by law;

g. All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated: January 28, 2026

Respectfully submitted,

By: */s/ Ahmad Keshavarz*

LAW OFFICE OF AHMAD KESHAVARZ
Ahmad Keshavarz, Esq.
16 Court St., Suite 2600
Brooklyn, NY 11241
Phone: (718) 522-7900
ahmad@NewYorkConsumerAttorney.com